## MEEK *v.* YAROWSKY.

1. PARTNERSHIP—APPEAL AND ERROR—ISSUE ON APPEAL IS DE NOVO ON RECORD MADE IN COURT BELOW.

 Where, in a suit for the dissolution of an alleged partnership, a temporary injunction, the appointment of a receiver, and for an accounting, the court below dismissed the bill on the ground that no partnership was found to exist, the issue for trial *de novo* on the record made in the court below, on plaintiff's appeal, is the existence of the alleged partnership.[1]

2. SAME—PREPONDERANCE OF EVIDENCE SUFFICIENT.

 It was not incumbent on plaintiff to prove the existence of said partnership beyond a reasonable doubt; a preponderance of convincing testimony being sufficient.[2]

3. SAME—EVIDENCE—SUFFICIENCY.

 Evidence reviewed, and *held*, sufficient to prove the existence of a partnership as alleged by plaintiff.[3]

---

[1]Partnership, 30 Cyc. p. 749; [2]Id., 30 Cyc. pp. 413, 737; [3]Id., 30 Cyc. p. 413.

Appeal from Wayne; Jayne (Ira W.), J.   Submitted January 8, 1926.    (Docket No. 68.)    Decided October 4, 1926.

Bill by Carl Meek against Abe Yarowsky for the dissolution of an alleged partnership, a temporary injunction, the appointment of a receiver, and an accounting.    From a decree dismissing the bill, plaintiff appeals.    Reversed and remanded.

*Louis B. Ver Wiebe,* for plaintiff.

*Wicker & Quaine* (*Seth J. Wicker,* of counsel), for defendant.

STEERE, J.   Plaintiff, Meek, filed this bill on October 4, 1922, for the purpose of obtaining dissolution of an alleged partnership in the trucking business between himself and defendant, Yarowsky, asking to that end a temporary injunction, appointment of a receiver, and an accounting.   Defendant seasonably answered, denying such partnership, and on November 2, 1922, the court, by an interlocutory order, appointed defendant Yarowsky himself receiver, on his giving a bond in the penal sum of $5,000 to faithfully perform his duties as such and be answerable to the court in all particulars pending determination of whether or not such partnership existed.

The case came to hearing October 5, 1923, on pleadings and proofs taken in open court, resulting in a brief decree dismissing plaintiff's bill of complaint on the ground, as counsel concede, that no partnership was found to exist which, on plaintiff's appeal, is the issue for trial *de novo* by this court on the record made in the court below.

The parties to this suit are residents of Detroit and had known each other at the time they entered into the business relations involved here for over two years

and a half.    Meek alleges in his bill and claims in his proofs that he left his employment as a truck driver for the city of Detroit at $40 per week and entered into a contract of partnership to engage in the truck business with defendant on April 6, 1920.    This Yarowsky positively denies, claiming their contract relations at that time merely consisted of his employing Meek as a truck driver.    The issue is squarely one of fact.    The argument of counsel indicates that the trial court disposed of the case on the theory that the parties to the transaction were equally creditable and plaintiff had not made out his case by a preponderance of evidence.

Meek is a native of Kentucky, of meager education, who, some years prior to this transaction, moved to and settled in Detroit with his wife, there following the vocation of a truck driver.    He had driven a mail truck for the United States in Detroit for some time and for about three years had been employed as a truck driver in the sidewalk department of the city.

Yarowsky's nativity is not shown.    His business for the last 15 or 16 years was, amongst other things, conducting rooming houses.    He then ran four, owning one and renting three.    Plaintiff and his wife had occupied two rooms in one of his houses for some time, she paying the rent by caring for rooms, doing the sweeping and cleaning up the room "if a roomer moves out."

Meek's version of this transaction is that in a casual conversation between them during the latter part of February, 1920, Yarowsky asked him what he would do if he had $1,000, to which he replied that he would put it into a truck.    A short time later Yarowsky came to him and said he had money to make a down payment on a truck if Meek would go into partnership with him, as he did not know anything about trucks.    To this Meek replied favorably and during

the talk suggested a Mack truck.    They then went up and looked at Mack trucks and on his selection they purchased for $6,633 a 5½ ton Mack dump truck on time, Yarowsky making the first payment of $1,700 and taking the truck in his name until it was paid for, to secure his down payment.

Their partnership agreement was for Meek to take charge of the truck and drive it, get work for it, have an allowance of $40 a week to live on, run the truck business in his own name, collect what was earned, indorse the checks he received therefor and turn them over to Yarowsky who was to buy the oil and gasoline.    They were to be partners on a 50-50 basis and share losses as well as profits.

After the truck was ordered it was expected to be promptly delivered.    Meek gave up his employment with the city as a truck driver at $40 a week, but had to wait over three weeks for the truck to arrive. When it was delivered he secured his first contract with the United Fuel & Supply Company, where he worked for 8 months, earning $5,897.    Following that he obtained more work from such concerns as the Birmingham Sand & Gravel Company, Robert Oakman, the city, and others.    As he collected for his work, he indorsed the checks and turned them over to his partner, Yarowsky.    During the 17 months he ran the business, he earned and turned over to him over $10,000.    For the first eight months he received his $40 a week allowance, which was then reduced to $35 and during the four months before he quit it was reduced to $18 per week, on Yarowsky's protests that he was short of funds and they must cut down expenses if they were going to buy another truck, as they had planned to do.    When he learned the truck was fully paid for, which was under their agreement to then be in both their names, he again asked that their partnership agreement be put into writing, as he had before more than once, but Yarowsky went

back on his word and refused to recognize any partnership. He then quit, or as Yarowsky states their severance of relations, "I told him to look for another place."

Asked on cross-examination why he did not have their agreement in writing before, he said that when he requested it Yarowsky objected, giving, among other reasons, that he did not want his brother to know that he was dealing with a Gentile. Yarowsky met this with direct denial but explained that all the truck business was conducted in Meek's name "because he say if he mentioned my name in the contracts he could not get the jobs, so I said, 'Go ahead.'"

Yarowsky's account of their agreement and subsequent relations is in part as follows:

"I was sitting talking to him and he said, 'If you want to make money I have a good idea how you can make it.' I say, 'How?' He say, 'You will buy a truck and I will run it for you and we will make good.' He said, 'I can't stand the inside work.' * * * I say, 'All right, I have $200 of my own.' I say, 'How much will it take,' and he say, 'About $1,600 or $1,700,' and I say, 'I will see my friends and if I can get enough money I will buy it.' * * *

"*Q.* Was there anything said at that time about a partnership?

"*A.* Never mentioned. * * *

"*Q.* What were the terms under which you employed him—did you get a truck?

"*A.* Yes.

"*Q.* In whose name did you buy it?

"*A.* In my name. * * *

"*Q.* What was the arrangement with regard to money?

"*A.* He said he will get jobs for me and I shall pay him $40.00 a week and done it, just run the truck. * * *

"*Q.* Whose name was on the truck?

"*A.* His name, because he said if it was in his name he could get the jobs better.

236—Mich.—9.

"*Q*. Who proposed having his name on the truck?

"*A*. He did and I didn't care.

"*Q*. That was the reason he gave you?

"*A*. Yes, sir; I said, 'Do whatever you want.'

"*Q*. Did you understand when he put his name on the truck to make him a partner?

"*A*. Never in my life.   *   *   *

"*Q*. Those were wages you paid him or advancement on the partnership?

"*A*. Wages, never mentioned about partners and he knows it, too.

"*Q*. He turned these checks over to you, money collected?

"*A*. Yes, sir.   I didn't look at it even.   *   *   *

"*Q*. When did you first know that Carl Meek claimed a partnership in this truck?

"*A*. When they started suit.

"*Q*. When this bill of complaint was filed?

"*A*. Yes, that paper.   *   *   *

"*Q*. If you know, when was this truck paid for?

"*A*. To tell the truth I can't tell myself.   My brother used to keep books for me.

"*Q*. It is paid for now?

"*A*. Yes, but I borrowed over $1,500.   *   *   *

(Cross-examination) :

"*Q*. Well, how long had you known Mr. Meek prior to that time?

"*A*. Five or six years, from now.

"*Q*. Then you knew him about two or three years before the truck was bought?

"*A*. Yes, sir.

"*Q*. And during all of that time that you knew him you knew that he was working on a truck somewhere?

"*A*. Yes, sir.   *   *   *

"*Q*. How much did Mr. Meek get from you?

"*A*. Forty dollars a week, first year and the second year thirty-five and then eighteen and didn't maybe a couple of weeks, before I—

"*Q*. For how long a period did he get $18 a week?

"*A*. I couldn't say, maybe five or six months, something like that.

"*Q*. Then according to your figuring you would say that Mr. Meek was operating that truck for about two years and a half?

"*A.* I don't know how long; no, it wasn't that long.
\* \* \*

"*Q.* You say you let Mr. Meek do just as he wanted to, you would let him sign the papers and make contracts?

"*A.* Because I couldn't sign.

"*Q.* Can't you write your own name?

"*A.* Yes, but it looks awful bad so I leave it to somebody else.

"*Q.* Do you always let somebody else handle all of your money?

"*A.* I haven't got no money; I never was in a bank in eighteen years, I bank about couple thousand dollars.
\* \* \*

"*Q.* You said in paragraph 8 (of his answer) that you took all the checks and they were turned over to you and that you deposited them in your own name, was that true?

"*A.* I took the checks and gave them to my brother.

"*Q.* You say they were put in your name?

"*A.* I didn't put them in the bank, never. \* \* \*

"*Q.* Now, Mr. Meek was able to go around and sign up these contracts and work and collect about $10,000?

"*A.* I don't know how much he collected; I didn't keep any account; my brother kept; \* \* \*

"*Q.* Well, Mr. Meek signed up a lot of contracts?

"*A.* He did.

"*Q.* What did you do in connection with this partnership business?

"*A.* No partnership; I pay him every week and I tended to my rooming houses.

"*Q.* What did you do with this truck, did you ever work on the truck?

"*A.* I never did.

"*Q.* The only thing you did was to collect the checks?

"*A.* Yes, I did, but that was my own money.

"*Q.* You knew that when a check is made payable to a man he can cash the check and get the money?
\* \* \*

"*A.* Sure.

"*Q.* There was no check ever brought to your attention or nothing ever brought to your attention that he cashed a check without giving you the money?

"*A.* No.

"*Q.* In that way he was honest?

"*A.* Yes."

The General Casualty Insurance Company insured the truck in 1921 for Yarowsky.     Later they had an accident with the truck and upon making a claim for loss it appeared upon the application for insurance that the plaintiff had an interest in the truck.     Mr. Hulbert, representing the insurance company as superintendent of claims, asked Meek in the presence of Yarowsky why he was doing all the talking as Yarowsky was able to talk English so he could understand him.     In the talk which followed it appeared that the two were working this truck together under circumstances indicating a partnership, as detailed by Meek. Witness Hulbert was asked and answered as follows:

"*Q.* Did Mr. Yarowsky have any objections at that time to the statements being made by Mr. Meek?

"*A.* Well, he stated that that was true.

"*Q.* Was there any change made in the policy as a result of this conversation?

"*A.* No, not to my knowledge, no change in the policy.     The application at that time was that Mr. Meek did have an interest in it.

"*Q.* What is the policy of your company if the assured wishes to change the names of the parties interested?

"*A.* They must make application.

"*Q.* Can any one else make that application?

"*A.* No, sir."

Yarowsky's testimony upon this subject is as follows, in part:

"*Q.* You let Mr. Meek testify up there at the insurance company that he was your partner?

"*A.* Yes, to get more money out of the insurance company.

"*Q.* So you were willing to let him do anything and say anything as long as you got more money?

"*A.* Well, I trusted him."

A careful comparison of the testimony of the two

.parties to the suit is persuasive that plaintiff's is more consistent and better supported by attending circumstances than that of defendant.

Meek's testimony is also supported by that of other witnesses and written evidence. Mrs. Meek, who was better educated than her husband, took an active interest in this transaction and was present when the agreement was entered into. She testified:

"Mr. Yarowsky asked my husband what he would do if he had a thousand dollars, and my husband said he would buy a truck and nothing more was said for a time, and later on he said: 'If I was to buy a truck would you go in partners with me? I have enough money to make a payment down on the truck.' And my husband said, 'I will be glad to.'

"Q. At that time was your husband working?

"A. Yes, sir.

"Q. What was the understanding between the two as to the personal arrangement in this case?

"A. The truck was to go in Yarowsky's name until it was paid for.  *  *  *

"Q. What was said at that time between Mr. Meek and Mr. Yarowsky?

"A. Well, he said that day the truck came and that night, I don't remember which one made the remark how it was going to be run and how we were going to arrange it, so they finally came to the conclusion he would give us an allowance of $40 a week to live on and he was to furnish the gas and oil and my husband to drive the truck and get all the jobs and collect the money and indorse the checks and hand them over to Mr. Yarowsky, which he did.  *  *  *

"Q. What did Mr. Yarowsky say on that evening, the night the truck came?

"A. Well, he said they were to go fifty-fifty on everything after the truck was paid for."

She went to the office with them when they obtained the truck license in 1922, and signed both their names to the application. Of this she was asked and answered:

"*Q.* How did it happen that Mr. Yarowsky did not write that?

"*A.* He said he did not have his glasses and would I write it and I did all his writing for him.

"*Q.* Did Mr. Yarowsky stand beside you?

"*A.* Yes, right by my side.

"*Q.* Was there a notary public present at that time?

"*A.* Well, there was a man from the Automobile Club; he made out the application and he said to me to sign it and I signed my husband's name to it, and then I turned the pen and paper to him and so he says, 'You sign it Mrs., I haven't got my glasses,' and I said to this man standing at the end of the counter, 'Is it all right?' and he says, 'As long as he is standing there and tells you to do it, it is all right,' and I did.

"*Q.* The name 'partner' appears on there. Was there anything said at that time about the word 'partner?'

"*A.* I walked over to the notary public and when he went to check it off he says, 'What is this?' He said, 'Is it a partnership name?' And I said, 'Yes, between my husband and this man.' And this man held up his hand and was sworn in the same as he put it down partnership.

"*Q.* Was there anything said by Mr. Yarowsky in your presence regarding the partnership?

"*A.* No, not a word, only he said when the man said, 'Is this a partnership?' And he said, 'Yes' and I said 'Yes.'"

A witness named Harry Stiles, who was also a truck driver and acquainted with the parties, stated that Meek told him the latter part of March he and Yarowsky were going to get a new truck. He heard it when he was at Meek's home and in the presence of Yarowsky.

"*Q.* What was said in the course of the evening while these people were together?

"*A.* Well, I heard that evening they was partners; I supposed they were partners all the time, they was talking about getting another truck if business kept up like it was and Mr. Yarowsky said, 'Do you know where I can get another good driver?' and I said, 'Yes, I am,' and he said, 'You will have to see Mr. Meek.'

"*Q.* Mr. Yarowsky made that statement himself?

"*A.* Yes, sir, * * * that was a common occurrence; that if I wanted to get a job I would have to see his partner. * * *

(Cross-examination):

"*Q.* You don't know anything about an agreement between him and Mr. Yarowsky, do you?

"*A.* The first night I heard him say that was his partner and on different occasions I heard that, every time I went over there.

"*Q.* And yet you kept asking Yarowsky for the job?

"*A.* And he told me to go and see his partner.

"*Q.* And you never got the job?

"*A.* He never got the truck."

It was not incumbent on plaintiff to prove his contention beyond a reasonable doubt, but by a preponderance of convincing testimony.

It is undisputed that Meek was a truck driver with years of experience in operating, managing and caring for trucks, with a record of employment for years in that service by the Federal government and the city of Detroit; that he threw up an apparently permanent employment by the city, with no uncertainty as to pay, responsibility or results beyond doing his day's work as a truck driver, for the uncertainties, extra duties and responsibilities of his engagement with Yarowsky, which the latter testifies was a bare hiring as a truck driver for the same wages, and explains Meek's willingness to undertake those extra duties and responsibilities with attending uncertainties because, as Meek told him, "I can't stand the inside work," when he was then employed and had been for years as Yarowsky well knew, at outside work as a truck driver. Not only is plaintiff's testimony of a partnership more consistent, definite, and convincing than defendant's to the contrary, but it is supported by undisputed attending circumstances and the testimony of other witnesses.

The decree of the lower court is reversed, a partnership found proven, and the case remanded for an accounting and such further decree as that court may then decide, with costs of this court to appellant.

BIRD, C. J., and SHARPE, SNOW, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.